## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>AGSPRING MISSISSIPPI REGION, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 21-11238 (CTG)<br>(Jointly Administered)<br><br>Objection Deadline: April 11, 2022 at 4:00 PM<br>Hearing Date: April 18, 2022 at 2:00 PM<br><br>**Re: D.I. 337, 338** |

### OBJECTION OF LARRY TUBBS, TUBBS RICE DRYERS, INC., CHIEF VENTURES, L.L.C. AND BIG RIVER GRAIN, LLC TO (I)THE DISCLOSURES IN THE PLAN PROPONENTS' COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, AND (II) THE SOLICITATION PACKAGES, PROCEDURES, AND BALLOTS

Larry Tubbs, Tubbs Rice Dryers, Inc., Chief Ventures, L.L.C. and Big River Grain, LLC (collectively, the "Tubbs Parties"), hereby submit this objection (the "Objection") to the Debtors' motion (the "Solicitation Procedures Motion") [D.I. 338] seeking approval of the proposed disclosure statement (the "Disclosure Statement") contained in the *Plan Proponents' Combined Disclosure Statement and Joint Plan of Liquidation Pursuant To Chapter 11 of The Bankruptcy Code* (the "Joint Plan") [D.I. 337] and seeking approval of proposed procedures and ballots for soliciting votes on the Plan (the "Solicitation Procedures"). In support of this Objection, the Tubbs Parties respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Agspring Mississippi Region, LLC (9147); Agspring MS 1, LLC (6456); Agspring MS, LLC (2692); Lake Providence Grain and Rice LLC (1986); and Bayou Grain & Chemical Corporation (7831). The Debtors' mailing address is 5101 College Boulevard, Leawood, KS 66211.

## PRELIMINARY STATEMENT

The Debtors' liquidating cases have culminated in  the Joint Plan filed by the Debtors and the Debtors' insider prepetition lenders (the "Insider Lenders").  As the Court is well aware, the Debtors' only remaining asset is collateral of the Tubbs Parties securing the Debtors' longstanding obligations to the Tubbs Parties (the "Collateral"), obligations to which there is no real or genuine dispute.  The Debtors have claimed this dispute is the sole basis for continuing these cases and confirming a plan.  From the Tubbs Parties' perspective, the Debtors and Insider Lenders seek not to resolve a dispute over the Collateral, but instead have gerrymandered classes of creditors, intend to cram down the Tubbs Parties, and obtain releases, exculpation and discharge for not only the Debtors, but the Insider Lenders, and even ***non-debtors***, at the expense of the Collateral and the Tubbs Parties.  The class structure in the Joint Plan highlights the disparate treatment the Debtors have afforded the secured claims of the Tubbs Parties and the Insider Lenders, and even the unsecured claims of the Tubbs Parties and other general unsecured creditors of Agspring Mississippi Region, LLC ("AMR") (*see, i.e.*, Class 7 of debtor AMR, which receives a 98% distribution).

The Court is also well aware that the Tubbs Parties filed a prepetition suit in Louisiana against:  1) the Debtors AMR and Lake Providence Grain and Rice, LLC ("Lake Providence"); 2) the Debtors' non-debtor parent companies, Agspring, LLC ("Agspring") and Agspring Holdco, LLC ("Holdco"); and 3) non-debtors Pacific Investment Management Company ("PIMCO"), and Barings, LLC asserting multiple claims (the "Louisiana Litigation").[2]  The Joint Plan proposes, among other things, "full and final satisfaction" of the claims of the Tubbs Parties.  Although not

---

[2] Agspring, Holdco, PIMCO and Barings are not debtors, and collectively referred to herein as "the Non-Debtor Defendants."

made clear by the Debtors and the Insider Lenders in the Disclosure Statement and the Joint Plan, that treatment appears to extinguish the direct claims of the Tubbs Parties in the Louisiana Litigation against all of the Non-Debtor Defendants for repayment of the debt or damages for AMR's inability to pay.

The Tubbs Parties respectfully submit the Joint Plan is patently unconfirmable, and that the Disclosure Statement fails to explain in clear terms, among other things, why the Joint Plan meets the *Continental* standard of fairness and necessity to a reorganization. The Disclosure Statement also lacks clear and adequate disclosure in other areas that would advise creditors and the Court of the Debtors' plan to dispose of the Collateral, the impact on the Tubbs Parties' claims against the Debtors and the Non-Debtor Defendants and on the effect of the continued prosecution of the Louisiana Litigation. Among other things, the Disclosure Statement:

- creates ambiguity over whether the Tubbs Parties can or cannot vote on the Joint Plan without filing a 3018 Motion;

- fails to disclose the funding source for the $750,000 "contribution" to the Tubbs Parties.

- fails to disclose any basis for a release of Non-Debtor Defendants.

- fails to adequately describe the basis for the allocation of the proceeds of the Big River Sale among the Debtors, including but not limited to identifying encumbered and non-encumbered proceeds;

- fails to offer any information to address the undecided question of whether the $8,870,281.20 payment made to the Insider Lenders was an adequate protection payment or was a payment on account of their secured claim, and from which of the Debtors' assets the funds were obtained;

- does not provide a separate Chapter 7 liquidation analysis for each Debtor such that the Tubbs Parties cannot discern whether they would get more in a Chapter 7 case for each debtor than they would get from that Debtor under the proposed Joint Plan;

- fails to address why the value of the Tubbs Properties decreases in value from a Chapter 11 to a Chapter 7, but the Insider Lenders' collateral increases value, where much of the same property is claimed as security by both parties;

- fails to describe the basis for or terms of the surcharge on any sale of the Collateral.

- contains a woefully inadequate description of the Louisiana Litigation, for example, by failing a) to discuss the Tubbs' Parties revocatory action asserting that the Dunn and Crowville assets were wrongly transferred to Lake Providence, and for which the Joint Plan proposes to distribute to the Lenders all of the unencumbered proceeds from the Big River Sale, instead of dividing these proceeds pro-rata as part of AMR's plans,[3] or b) to address the suit against PIMCO, who held itself out as the Term Note Holder, for recharacterization of that Term Loan and how this relates, if at all, to the Insider Lenders' claims based on the Term Loan.[4]

- fails to provide for contingencies in the event that a decision on the revocatory action on the Crowville and Dunn properties makes the proceeds from the Big River Sale part of the estate of AMR and not Lake Providence;

- does not disclose whether or how the Debtors intend to preserve evidence potentially relevant to the Louisiana Litigation after the effective date of the Joint Plan;

- creates ambiguity over whether the Tubbs Parties' mortgages and liens are maintained over the Tubbs Properties or their proceeds after a final decision on the Insider Lenders' adversary proceeding is rendered or after Joint Plan confirmation;

- does not disclose how or when the Debtors will determine whether to sell or surrender the Tubbs Properties, how or when the Tubbs Parties will receive notice of any sale to preserve their rights to credit bid, or how the Tubbs Parties will know when or how much to place in escrow as part of the Debtors' decision to surrender the Tubbs Properties as discussed a Section III.2 at page 18 of the Disclosure Statement.

Unless the Debtors modify the Disclosure Statement and Joint Plan to fully and clearly disclose how the Joint Plan affects the outcome of these cases to the Tubbs Parties, and addresses the fatal defects that will prevent its confirmation, augment the Disclosure Statement with fulsome and clear disclosure regarding each of the issues above, and remedy the related defects in the Solicitation Packages, Procedures and Ballots, the Disclosure Statement and Solicitation Packages and Ballots should not be approved.

---

[3] This is not part of the challenge issue as it relates to the ownership of these properties, not the validity or the amount of the liens granted by the Debtors.

[4] *See* Joint Plan, pp. 35-38. In addition, excluding a description of the substance of the Louisiana Litigation, the Debtors incorrectly identify the Tubbs Note as unmatured, when in fact, as set forth in the Louisiana Litigation, the Note is matured as the maturity date was accelerated upon the event of default of non-payment in October 2018.

## BACKGROUND

1.      On October 8, 2021, the Tubbs Parties filed a motion for limited relief from the automatic stay [D.I. 81] in order to allow the Louisiana Litigation to proceed to judgment.  In their opposition to the motion for relief from stay, the Debtors represented to this Court that recent appraisals of the Collateral valued the property at $20.5 million.  *See* Debtors' Opposition to Motion of Tubbs Parties for Relief From Stay [D.I. 136 at ¶ 15].  Accordingly, the Debtors have conceded that the Tubbs Parties are undersecured, and that the Debtors have no equity in the Collateral.  The Court ultimately denied without prejudice the Tubbs Parties' motion for stay relief. [D.I. 178].

2.      On September 30, 2021, the Debtors filed a motion to sell certain of their assets [D.I. 61] (the "Sale Motion").  The Sale Motion specifically excluded the Tubbs Parties' Collateral from the proposed sale.  The Tubbs Parties filed a limited objection to the Sale Motion [D.I. 135], which the parties ultimately resolved.  The Order entered approving the Sale Motion preserved the Tubbs Parties' rights to seek to recover from the proceeds of the sale, and the Debtors' obligation to allocate proceeds from the sale.

3.      The only assets that remain in the Debtors' estates is the Collateral.  *See* Joint Plan; *see also*, Sale Hearing Tr. at 24 (The approved sale was for "the large bulk of the estate assets, Your Honor.  And other than the Tubbs collateral, I'm not aware that there are significant assets.").

4.      The Tubbs Parties filed their *First Amended Complaint* (the "First Amended Complaint") on December 17, 2019, against the Non-Debtor Defendants, AMR, and Lake Providence, and three individuals who have been dismissed with prejudice, Bruce Chapin, Mark Beemer, and Greg Kennedy.

5.     Specifically, the First Amended Complaint in the Louisiana Litigation seeks: 1) a judgment against AMR on the note owed to the Tubbs Parties, mortgages, and the right to seize and sell the property; 2) a judgment against Agspring on its guaranty of the note; 3) to revoke the fraudulent transfer of the Dunn and Crowville properties to Lake Providence because it caused or increased AMR's insolvency; 4) the return of unlawful distributions from AMR or Agspring LLC, including asserting that the loan established on the day of the sale to PIMCO, Barings, and AIM funds, which loan the Term Lenders claim is the basis of their Prepetition Secured Claim, was not a true loan, but an investment for which any payments were distributions subject to the rules on distributions during insolvency which debt should be recharacterized as equity; 5) to revoke fraudulent transfers of any other assets from AMR or Agspring LLC, including but not limited to the payment of excessive management fees to PIMCO; 6) judgment on alter ego claims; 7) damages under the Louisiana Unfair Trade Practices Act for the transfer of money and assets with the express intent to hinder, delay and defraud the Tubbs Parties' rights to have those assets satisfy the note; and 8) judgment on claims against officers and directors of Agspring, LLC and AMR, which claims were previously settled.

6.     The Debtors filed these Chapter 11 Cases on September 10, 2021. Contemporaneous with the filing of the Chapter 11 petition, the Defendants removed the Louisiana Litigation to the United States District Court for the Western District of Louisiana, case number 21-03268 (the "Western District Proceeding"). In response, the Tubbs Parties filed a Motion to Abstain and for Remand in the Western District Proceeding. PIMCO and the Agspring defendants filed Motions to Transfer Venue to this Court. All motions were opposed. A Report and

Recommendation was rendered on April 4, 2022 denying the motion to abstain and remand and granting the motions to transfer.  *See* Exhibit 1 attached hereto for the Court's convenience.[5]

7.      On March 28, 2022, the Debtors filed the Disclosure Statement and Joint Plan.  A hearing on the interim approval of the Disclosure Statement, the Solicitation Package, Procedures and Ballots is presently scheduled for April 18, 2022.

8.      On March 16, 2022, the Tubbs Parties filed their second motion for relief from the automatic stay (the "Second Stay Relief Motion") [D.I. 297].  The Second Stay Relief Motion is premised on the fact that the Debtors have no equity in the Collateral, and the Debtors have no business to reorganize.  The only parties with claims to the Collateral are the Tubbs Parties and the Insider Lenders.[6]  Separately, the Insider Lenders filed an adversary proceeding against the Tubbs Parties seeking a declaration of rights to the certain pieces of the Collateral under Louisiana law.  On March 30, 2022, the Court held a preliminary hearing on the Tubbs Parties' Second Stay Relief Motion and directed that all matters relating to confirmation of the Debtors' Joint Plan, the Insider Lenders' adversary proceeding, and the Tubbs Parties' Second Stay Relief Motion would be heard on the same date – May 27, 2022.

## **OBJECTION**

### I.      **THE DISCLOSURE STATEMENT FAILS TO MEET THE STANDARD FOR APPROVAL**

9.      The  chapter 11 plan proponent may only solicit votes to accept or reject that plan once the Court has approved the written disclosure statement for that plan as containing "adequate

---

[5] The Tubbs Parties will not oppose the transfer of the Louisiana Litigation. The Tubbs Parties reserve all rights, including  to a jury trial against the Non-Debtor Defendants.

[6] The Tubbs Parties dispute that the Insider Lenders have any legitimate claim to any of pieces of the Collateral.  *See* fn. 7 *infra*.

information." 11 U.S.C. § 1125(b). Section 1125(a) of the Bankruptcy Code defines "adequate

information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's books
> and records, including a discussion of the potential material Federal tax
> consequences of the plan to . . . a hypothetical investor typical of the holders of
> claims or interests in the case, that would enable such a hypothetical investor of the
> relevant class to make an informed judgment about the plan[.]

11 U.S.C. § 1125(a); *see also Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94,

100 (3d Cir. 1988); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 99-100 (Bankr. D. Del. 1999) (the

disclosure statement must contain information that is "reasonably practicable [to permit an]

informed judgment" by holders of claims or interests to vote on the plan); *see also Kirk v. Texaco,

Inc.,* 82 B.R. 678, 681 (S.D.N.Y. 1988).

10.    Although courts assess adequacy on a case-by-case basis, a disclosure statement

must contain "simple and clear language delineating the consequences of the proposed plan on

[creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or

reject the Plan." *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

In essence, a disclosure statement "must clearly and succinctly inform the average . . . creditor

what it is going to get, when it is going to get it, and what contingencies there are to getting its

distribution." *In re Feretti,* 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (citations omitted). The

information in the Disclosure Statement does not enable the Tubbs Parties, or creditors generally,

to fully assess the extent to which the Joint Plan will impact them and, in particular, what happens

based on outcomes in the Louisiana Litigation. *See infra*. Thus, the Disclosure Statement should

not be approved as adequate in its current form.

11.    Additionally, Courts will not approve disclosure statements that describe plans that

are "so fatally flawed that confirmation is impossible." *In re U.S. Brass Corp.*, 194 B.R. 420, 422

(Bankr. E.D. Tex. 1996); *see also John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 157 (3d Cir. 1993).  Because, as discussed more fully below, the Joint Plan cannot be confirmed in its current form, it would be counterproductive to approve the Disclosure Statement and authorize the Debtors to expend estate resources soliciting votes on an unconfirmable Joint Plan.  *See Route 37*, 987 F.2d at 157; *see also In re Beyond.com*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (denying approval of disclosure statement for unconfirmable plan); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. D. Pa. 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal 1999) (noting that it is well accepted that a court may disapprove a disclosure statement, even if it contains adequate information, where the underlying plan is not confirmable).

### A.    The Joint Plan Gerrymanders Classes Holding Similar Claims

12.    At the hearing on the Tubbs Parties' Second Stay Relief Motion, the Debtors' chief argument for maintaining these chapter 11 cases, proposing the Joint Plan, and continuing essentially a two-party dispute over the remaining assets of AMR, is that the bankruptcy process will resolve competing claims of the Tubbs Parties and the Insider Lenders under Louisiana law to the same alleged "personal property" (grain elevators) located at the Tubb Properties.[7]  Putting

---

[7] Under Louisiana law, "all things, corporeal or incorporeal, that the law does not consider as immovables, are movables." La. C.C. art. 475. Louisiana law has several code articles identifying the tests for what is an immovable and its component parts.

- "Tracts of land, with their component parts, are immovables." La. C.C. art. 462.
- "Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruit of trees are component parts of a tract of land when they belong to the owner of the ground." La. C.C. art. 464.
- "Things incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts."

aside for purposes of this Objection only the argument that the Insider Lenders' contention is meritless, there is no good faith justification for placing the Insider Lenders and the Tubbs Parties secured claims into separate classes for AMR in the Joint Plan.

13.     "[I]n analyzing whether claims within a given class are substantially similar, the focus of the classification should be on the legal character of the claim as it relates to the assets of the debtor." *In re W.R. Grace & Co.*, 475 B.R. 34, 109-10 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013) (internal citations and quotation marks omitted).  The "primary analysis centers upon the legal attributes of the claims and not upon the status or circumstances of the claimant. Emphasis is not upon the holder so much as it is upon that which is held."  *In re FF Holdings Corp.,* 1998 U.S. Dist. LEXIS 10741, *13 (D. Del. Feb. 17, 1998) (quoting *In re Northeast Dairy Cooperative Fed., Inc.*, 73 B.R. 239, 250 (Bankr. N.D.N.Y. 1987) ("To determine whether claims are "substantially similar," the proper focus is on "the legal character of the claim as it relates to the assets of the debtor."  *In re AOV Indus., Inc.,* 792 F.2d 1140, 1150 (D.C.Cir.1986) (emphasis omitted); *see also In re Tribune Co.,* 476 B.R. 843, 855 (Bankr. D. Del. 2012) (concluding that the phrase "substantially similar" reflects "the legal attributes of the claims, not who holds them" (internal quotation marks omitted)); *In re Quigley Co.,* 377 B.R. 110, 116 (Bankr.S.D.N.Y.2007)

---

La. C.C. art. 465.

- "Things that are attached to a building and that, according to prevailing usages, serve to complete a building of the same general type, without regard to its specific use, are its component parts. Component parts of this kind may include doors, shutters, gutters, and cabinetry, as well as plumbing, heating, cooling, electrical, and similar systems." La. C.C. art. 466.[7]

When one transfers an immovable, the transfer includes its component parts. La. C.C. art. 469. Conversely, corporeal movables, are things that "normally move or can be moved from one place to another." La. C.C. art. 471.  However, "materials gathered for the erection of new building or other construction, even though deriving from the demolition of an old one, are movables until their incorporation into the new building or after construction." La. C.C. art. 472.

("Claims are similar if they have substantially similar rights to the debtor's assets." (emphasis and internal quotation marks omitted)) *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013)).

14.    In determining whether the separate classification of substantially similar claims is permissible, "[i]t is a well-recognized principle that the classification of claims or interests must be 'reasonable' and cannot be grouped together for arbitrary or fraudulent purposes." *W.R. Grace*, 475 B.R. at 110.  The Third Circuit has recognized that the Code does not allow a plan proponent complete freedom to place substantially similar claims in separate classes.  *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs. (In re Route 37 Bus. Park Assocs.),* 987 F.2d 154, 158 (3d Cir.1993).  Instead, a classification scheme must be reasonable.  *Id.*  The Court in *John Hancock* wrote:

> [When] the sole purpose and effect of creating multiple classes is to mold the outcome of plan voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed. Otherwise, the classification scheme would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10).  *Id.* at 159. *See also Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274, 1279 (5th Cir.1991) ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."); *In re W.R. Grace & Co.,* 2012 WL 2130981 at *37 (D. Del. June 11, 2012) ("It is a well-recognized principle that the classification of claims or interests must be 'reasonable,' and cannot be grouped together for arbitrary or fraudulent purposes.")

*In re Tribune Co.*, 2012 WL 2885921 (Bankr. D. Del. July 13, 2012), *aff'd as modified,* 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd in part, rev'd in part sub nom. In re Tribune Media Co.*, 799 F.3d 272 (3d Cir. 2015), and *aff'd sub nom. In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018).

15.    Placing the claims of the Insider Lenders and the Tubbs Parties in different creditor classes for AMR violates § 1122 of the Bankruptcy Code.  The disparate classification is

particularly egregious here, where the classification is clearly intended to create a separate voting class for the Insider Lenders – Plan Proponents, who are the owners of the ultimate parent of AMR[8] – so the Debtors and the Insider Lenders can be assured of having the affirmative vote of one class of impaired creditors (the plan proponent Insider Lenders in Class 3 (impaired)) in favor of the Joint Plan).  "[T]here must be some limit on a debtor's power to classify creditors in such a manner [to assure that at least one class of impaired creditors will vote for the plan and make it eligible for cram down consideration by the court]."  *U.S. Truck Co., Inc.,* 800 F.2d 581, 586 (6th Cir. 1986). "Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class."

16.    The same is true for Class 7 of debtor AMR, which appears to be a separate class of unsecured creditors set up solely to obtain approval from an impaired class of general unsecured creditors receiving a 98% distribution.

17.    By classifying the Tubbs Parties and the Lenders' secured claims separately, and general unsecured claims against AMR separately, the Plan Proponents are improperly creating impaired classes solely to force a cram down.

---

[8] 11 U.S.C. §101(31)(E) defines "insider" as an "affiliate, or insider of an affiliate as if such affiliate were the debtor." The term "affiliate" means – (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities – (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote.  11 U.S.C. § 101(2)(A).  *See In re All Land Investments, LLC*, 468 B.R. 676, 692 (Bankr. D. Del. 2012).

### B.    The Joint Plan Treats Similar Claims Unequally

18.    The Disclosure Statement and the Joint Plan do not contain clear language describing how claims will be treated.  The AMR secured claims distribution descriptions are confusing and do not contain clear language showing how exactly the Debtors propose to treat the claims of the Insider Lenders compared to the secured claims of the Tubbs Parties.  Based on the information in the Joint Plan, the Joint Plan does not appear to give the same treatment to the secured claims of the Tubbs Parties and the Insider Lenders, even though those claims are secured by the same assets.

19.    "[E]quality of distribution among creditors is a central policy of the Bankruptcy Code" that is furthered by several different Code provisions.  *In re Combustion Eng'g,* 391 F.3d 190, 239 (3d Cir. 2004)(quoting *Begier v. IRS,* 496 U.S. 53, 58 (1990)) (internal quotation marks omitted).  Relevant here, § 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class."  *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013); *see* 5 Collier on Bankruptcy ¶ 1123.01[4] at 1123–8–1123–9.  Here, the Joint Plan uses different formulas for the Insider Lenders and for the Tubbs Parties to distribute assets of AMR.  *See* Joint Plan, pp. 40-41.  It is not clear how such distribution on account of secured claims – arising under the same laws – against the same collateral could result in a different treatment of  similarly situated creditors.  This makes clear that the placement of these creditors in different classes is a purposeful distribution scheme to treat the same claims to the same assets differently.

20.    The Joint Plan also creates a separate class of unsecured creditors for AMR (Class 7), who have no basis for receiving a 98% distribution on account of their claims when the Tubbs Parties' unsecured claim should be afforded the same treatment.

21.    Because the Joint Plan classifications are fatally flawed, the Disclosure Statement should not be approved.

### C.    The Joint Plan Impermissibly Grants the Debtors the Right to Change or Modify the Joint Plan After Confirmation and a Discharge

22.    The Joint Plan provides that the Debtors may "alter, amend, modify, revoke or withdraw the Joint Plan, or any part of it, at any time before Substantial Consummation. [Joint Plan, p. 4]. The term "Substantial Consummation" is not defined in the Joint Plan, but is simply deemed to occur on the Effective Date, which itself is an unclear event poorly describe in the Disclosure Statement.  If Substantial Consummation occurs after confirmation of the Joint Plan, then this provision gives the Debtors the unilateral right to alter Joint Plan terms without Court approval.

23.    The Joint Plan also provides that, "[u]pon the Effective Date, title to all assets of the Estates, including all Causes of Action the Debtors may hold against any Entity and any recoveries therefrom, shall be held by the Liquidating Debtors for the purposes contemplated under this Combined Disclosure Statement and Plan." Joint Plan, p. 73.  The Joint Plan further provides that, "all property that shall be held by the Liquidating Debtors shall be free and clear of all Claims, Equity Interests, Liens, interests, charges or other encumbrances of Creditors or Equity Interest Holders, other than as set forth herein, in the Final DIP Order and in relevant documents, agreements and instruments contained in any Joint Plan Supplement." *Id*.  This provision effectively grants the Debtors a discharge.

24.    Section 1141(d)(3) forbids a discharge to these Debtors. "The confirmation of a plan does not discharge a debtor if— (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of the title if the

case were a case under chapter 7 of this title." 11 U.S.C. § 1141(d)(3). *See In re Flintkote Co.*,

2012 WL 6681780 (Bankr. D. Del. Dec. 21, 2012), aff'd, 526 B.R. 515 (D. Del. 2014). The term

"discharge" means, "to release, liberate, annul; unburden; disincumber; dismiss. To extinguish an

obligation." Black's Law Dictionary, 6th Ed. (1990). Section XIII.B of the Joint Plan does just

that.

25.    Furthering the absolution goal, the Joint Plan grants "Exculpation" and "Releases."

Joint Plan XIII.D & E. The term "Exculpated Parties" means, "collectively the Debtors and the

Debtors' respective officers, including the Responsible Officer, managers, employees and Court-

approved professionals, provided however that none of the parties shall be entitled to exculpation

unless and solely to the extent they are found by a court of competent jurisdiction to have acted in

the capacities as fiduciaries of the Estates." Joint Plan, p. 11. The term "Released Parties" means,

"collectively, (a) the Debtors; (b) the Liquidating Debtors; (c) the [Insider] Lenders; and (d) each

of such Entities' respective successors and assigns, and respective current and former shareholders,

affiliates, subsidiaries, principals, employees, agents, officers, including the Responsible Officer,

directors, managers, trustee, partners, members, professionals, representatives, advisors, attorneys,

financial advisors, accountants and consultants." Joint Plan, p. 16.

26.    The Disclosure Statement discloses no grounds from which any creditor or any

party in interest can determine why the Exculpated Parties and Released Parties are entitled to

exculpation and releases, or why the liquidating Debtors, which are conducting no business, are

entitled to an effective discharge when § 1141(d)(3) forbids it.

D.    **The Joint Plan Impermissibly Releases Third Parties and the Disclosure Statement Fails to Provide Adequate Information About Third Party Releases[9]**

27.    While the Third Circuit has suggested, in *dicta*, that nonconsensual third-party releases might be permissible if supported by specific factual findings that such releases are fair and necessary to a debtor's reorganization, *see In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000), the Third Party Release falls far short of that standard.  Unlike debtors in the few chapter 11 cases where nonconsensual third-party releases have passed muster, the Debtors are liquidating, not reorganizing. The Non-Debtor Defendants are not employees of the Debtors, they have disclosed no contribution to the Joint Plan, and no benefit whatsoever to the Debtors' proposed post-confirmation liquidation activities has been articulated.  As proposed, the Third Party Release of the claims of the Tubbs Parties against the Non-Debtor Defendants is purely gratuitous for the Non-Debtor Defendants and a prejudicial loss for the Tubbs Parties, which is the antithesis of the "fair and necessary" touchstone identified in *Continental.*

28.    Section XIII.E.2 of the Joint Plan contains an express Third Party Release[10] of all liability of any kind or nature between the Debtors, the Liquidating Debtors, the Estates, Creditors, or Other Persons Receiving or who are entitled to receive distributions under the Joint Plan, except claims against the Tubbs Parties or between the Prepetition Term Lenders and the Prepetition Term Agent, as follows:

> ON, AND AS OF, THE EFFECTIVE DATE AND FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH ARE ACKNOWLEDGED, THE RELEASED PARTIES SHALL BE FOREVER RELEASED (THE "THIRD PARTY RELEASE") FROM ANY AND ALL CLAIMS, OBLIGATIONS, ACTIONS, SUITS, RIGHTS, DEBTS, ACCOUNTS, CAUSES OF

---

[9]  The use of the Combined Disclosure Statement and Plan procedure allowed by Bankruptcy Rule 3017.3 is inappropriate because the Plan includes non-consensual third-party releases.

[10]  "124. 'Third Party Release' shall have the meaning ascribed to it in Section XIII.E.2. of the Combined Disclosure Statement and Plan." Joint Plan, p. 17.

ACTION, REMEDIES, AVOIDANCE ACTIONS, AGREEMENTS, PROMISES, DAMAGES, JUDGMENTS, DEMANDS, DEFENSES AND LIABILITIES THROUGHOUT THE WORLD UNDER ANY LAW OR COURT RULING THROUGH THE EFFECTIVE DATE (INCLUDING ALL CLAIMS BASED ON OR ARISING OUT OF FACTORS OR CIRCUMSTANCES THAT EXISTED AS OF OR PRIOR TO THE EFFECTIVE DATE, INCLUDING CLAIMS BASED ON NEGLIGENCE OR STRICT LIABILITY, AND FURTHER INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE) WHICH THE DEBTORS, THE LIQUIDATING DEBTORS, THE ESTATES, CREDITORS, OR OTHER PERSONS RECEIVING OR WHO ARE ENTITLED TO RECEIVE DISTRIBUTIONS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN MAY HAVE AGAINST ANY OF THEM IN ANY WAY RELATED TO THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON AND BEFORE THE PETITION DATE, AND RELATED TO THE DEBTORS (OR THEIR PREDECESSORS), THEIR BUSINESS AND/OR THEIR ASSETS; PROVIDED, HOWEVER THAT THE FOREGOING RELEASES ARE GRANTED ONLY BY (A) CREDITORS WHO ARE CONCLUSIVELY DEEMED TO HAVE ACCEPTED THE COMBINED DISCLOSURE STATEMENT AND PLAN; (B) CREDITORS WHO RETURNED A BALLOT AND DID NOT CHECK THE OPT-OUT BOX ON THE BALLOT; AND (C) CREDITORS WHO WERE SENT A SOLICITATION PACKAGE, BUT EITHER (I) DID NOT VOTE; OR (II) DID NOT RETURN A BALLOT WITH THE OPT-OUT BOX CHECKED; PROVIDED, HOWEVER, THAT THE RELEASE PROVIDED IN THIS SECTION SHALL NOT APPLY TO A CREDITOR'S CLAIMS AGAINST THE TUBBS PARTIES SOLELY BASED UPON SUCH CREDITOR'S DIRECT CONTRACTUAL RIGHTS, IF ANY, AGAINST THE TUBBS PARTIES, PROVIDED FURTHER THAT NOTHING IN THIS SECTION SHALL RELEASE ANY RELEASED PARTY FROM ACTS THAT ARE JUDICIALLY DETERMINED TO CONSTITUTE FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. FOR AVOIDANCE OF DOUBT, THE LENDERS SHALL BE DEEMED TO HAVE GRANTED THE THIRD PARTY RELEASE; PROVIDED, HOWEVER THAT THE THIRD PARTY RELEASE DOES NOT RELEASE ANY OBLIGATIONS, ACTIONS, SUITS, RIGHTS, DEBTS, ACCOUNTS, CAUSES OF ACTION, REMEDIES, AVOIDANCE ACTIONS, AGREEMENTS, PROMISES, DAMAGES, JUDGMENTS, DEMANDS, DEFENSES AND LIABILITIES BETWEEN OR AMONG THE PREPETITION TERM AGENT, ON THE ONE HAND, AND THE PREPETITION TERM LENDERS, ON THE OTHER HAND.

Joint Plan, p. 82.

29.     The Joint Plan also enjoins "all entities who have held, hold or may hold claims against or equity interests in the debtors or the estates that arose prior to the effective date" from doing anything "that does not conform to or comply with the provisions of the combined disclosure

statement and Joint Plan with respect to such claim or interest, including without limitation, any act taken in violation of section XIII.E.2, against any of the Released Parties with respect to any matters released" under the Joint Plan (the "<u>Plan Injunction</u>").  Joint Plan, p. 83.

30.     The Joint Plan also provides that, upon confirmation, the consideration that the Tubbs Parties receive on account of their secured and unsecured claims is "in full and final satisfaction of and in exchange for" those claims.  Joint Plan, pp. 41, 43, *see also id*. at p. 68 [Section X.F], p. 76 [Section XIII].  As set forth above, on September 30, 2019, the Tubbs Parties filed the Louisiana Litigation against certain of the Debtors, certain non-debtor affiliates of the Debtors and several investment funds that purchased the ownership interests in the Debtors' immediate parent company Agspring, LLC, a non-debtor entity.  The "full and final" satisfaction of either the Allowed Tubbs Secured Claim or the Allowed Tubbs Parties' Unsecured Deficiency Claim appears to be an attempt to impose on the Tubbs Parties a release of the Debtors, the Insider Lenders, and certain third-parties.  Even if the Third Party Release were stricken from the Joint Plan, a "full and final" satisfaction of the Tubbs Parties claims would effectively end the Louisiana Litigation and release all claims ***against the Non-Debtor Defendants***.

31.     Under Louisiana Civil Code article 3079, "a compromise is also made when the claimant of a disputed or unliquidated claim, regardless of the extent of his claim, accepts a payment that the other party tenders with the clearly expressed written condition that acceptance of the payment will extinguish the obligation."  "A compromise precludes the parties from bringing a subsequent action based upon the matter that was compromised."  La. C.C. art. 3080.  Thus, the Plan Proponents' use of the phrase "full and final satisfaction" extinguishes all of the claims because the Tubbs Parties' damages in the Louisiana Litigation are the unpaid amounts owed under

the note.  Full and final satisfaction of the claims of the claims of the Tubbs Parties extinguishes the Tubbs Parties' Louisiana Litigation claims.

32.    In the Third Circuit, nonconsensual third party releases are permissible in plans of reorganization if they meet the *Continental* standard of fairness and necessity to the reorganization. That standard requires: (1) an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.  *In re Millennium Lab Holdings II, LLC*, 2017 WL 4417562 (Bankr. D. Del. Oct. 3, 2017), aff'd, 591 B.R. 559 (D. Del. 2018), aff'd sub nom. *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019).  "Our precedents regarding nonconsensual third-party releases and injunctions in the bankruptcy plan context set forth exacting standards that must be satisfied if such releases and injunctions are to be permitted, and suggest that courts considering such releases do so with caution."  *Id*. (citing *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011) (en banc)).  Here, the Plan proponents have failed to provide any information from which one could discern whether any of these five factors permit release of non-debtors from the Louisiana Litigation, including but not limited to disclosing how any of the $750,000 the Insider Lenders propose to "gift" to the Tubbs Parties is substantial consideration from the Non-Debtor Defendants.[11]

---

[11] Section XIII of the Plan appears to require an affirmative Opt-Out of the Third-Party Release.

33.     The Tubbs Parties are constitutionally entitled to adjudication of their claims in the Louisiana Litigation in an Article III tribunal (the District Court), these claims cannot be released or otherwise adjudicated by this Court.   The Third Party Release renders the Joint Plan unconfirmable because this Court lacks jurisdiction, constitutional adjudicatory authority, or both to release any direct, non-bankruptcy, non-core claims asserted by Tubbs Parties against the Non-Debtor Defendants in the Louisiana Litigation.

> ### E.     The Disclosure Statement Makes Ambiguous Whether The Tubbs Parties Can Vote On the Joint Plan without filing a 3018 Motion

34.     The Disclosure Statement and Joint Plan suggest that the Tubbs Parties are entitled to vote on the AMR Plan.  Joint Plan, p. 46.  However, the definitions in the Disclosure Statement and treatment of the Tubbs Parties' claims create ambiguity on this issue.

35.     "Tubbs Secured Claims" means the Tubbs Parties' Secured Claims against AMR in an aggregate amount equal to the Allocated Value (Tubbs Properties – LT), less any amounts surcharged by the Debtors pursuant to § 506(c) of the Bankruptcy Code as Allowed pursuant to a Final Order of the Bankruptcy Court or otherwise agreed by the Debtors in writing and approved by the Bankruptcy Court at or prior to the Combined Hearing."  Joint Plan, p. 19.

36.      Under the Joint Plan, unlike the Code, an "Allowed" claim is one "scheduled by the Debtors on the Schedules as liquidated in amount and not disputed or contingent, and to which no party in interest has filed an objection thereto."  Joint Plan, p. 6.  The Debtors have improperly identified the Tubbs Parties' Claims as contingent and unliquidated, thus under the Joint Plan, the Tubbs Parties Claims are not Allowed, even though the Debtors have not filed an objection to the Tubbs Parties' claims.  Votes on the Joint Plan are only counted if they were cast by parties with Allowed Claims or who have filed a Motion under Rule 3018 to have their claims deemed allowed for voting purposes.

Unless otherwise Ordered by the Bankruptcy Court, only Holders of Allowed Claims and Equity Interests in AMR Classes 3, 4, 5, 6, and 7, AGMS1 Classes 3 and 5, AGMS Class 4, LakeProv Class 4, and Bayou Class 4 may vote on the Combined Disclosure Statement and Plan. Further, subject to the tabulation procedures that were approved by the Solicitation Procedures Order, in order to vote on the Combined Disclosure Statement and Plan, you must hold an Allowed Claim in the above Classes, or be the Holder of a Claim in any such Class that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

Joint Plan, p. 48.

37.     Since the Debtors have scheduled the Tubbs Parties' claims as contingent and unliquidated but the Joint Plan indicates that the Tubbs Parties are entitled to vote, it is unclear whether the Tubbs Parties must first file a 3018 Motion to have their votes count.

**F.      The Disclosure Statement is Unclear on the Disposition of the Tubbs Properties**

38.     The Joint Plan provides definitions for "Tubbs Properties Liquidation Event" and "Tubbs Properties Surrender Event" and "Tubbs Sale" [Joint Plan, pp. 18-19] and states, "[o]ver the last few months, the Debtors have negotiated an asset purchase agreement with a stalking horse bidder for a sale of the Mer Rouge property.  The Debtors intend to file the related sale motion shortly." *Id*., p. 29.  Later, the Joint Plan "proposes to **either** sell or surrender the Tubbs Properties to the Tubbs Parties **subject to the terms in the [Joint Plan]**." *Id*. at 32 (emphasis added).  The Joint Plan also states, "the Debtors intend to oppose the Second Tubbs Stay Relief Motion as these properties are essential to a successful reorganization." *Id.* at 29.  Thus, there is no clear disposition of the Tubbs Properties in the Joint Plan, even though the Debtors are liquidating and have no use for the Tubbs Properties.  The Debtors have not provided any APA for a sale, noticed a hearing for the sale, or even provided information so that one could determine when and how the Debtors will decide whether to sell or surrender the Tubbs Properties.  It is unclear under the Joint Plan how the Tubbs Properties will be disposed, how the Tubbs Parties would receive notice of the

Debtors' intention to sell so that they could enforce their rights to credit bid, or if there is a possibility the Tubbs Properties will revert to the Liquidating Debtors.

39.    Further, the Court has indicated its desire to resolve all remaining issues at the hearing to confirm the Joint Plan, including the Tubbs Parties' Stay Relief Motion and the Lenders' Adversary Proceeding, yet the Debtors have withheld and refused to file their intended objection to the Tubbs Parties' claims and a sale motion to sell the Tubbs Properties to a stalking horse bidder.  The Debtors have also not explained how the Joint Plan will be affected by the issues raised in the Louisiana Litigation, which relate directly to the claims of the Insider Lenders to assets of the Debtors.  These questions relate directly to issues the Court stated its intention to consider and resolve on May 27, 2022.

### G.    The Joint Plan Proposes to Surcharge the Collateral

40.    The Joint Plan also states the sale of the Tubbs Properties will be surcharged.  Joint Plan, p. 19.  Yet, the Debtors have provided no basis to determine a surcharge, the amount of the surcharge, or why surcharge of the Tubbs Properties is justified when the Debtors have no equity in the Tubbs Properties, even though the Tubbs Parties have twice sought relief from the automatic stay to pursue a public foreclosure proceeding and alternatively, repeatedly offered to credit bid for the Tubbs Properties.  The surcharge is further unfair and inequitable because Debtors agreed to waive rights to surcharge the same collateral claimed by both the Tubbs Parties and the Insider Lenders. D.I. 174.  Because the Debtors and the Insider Lenders posit that a portion of the Tubbs Properties is actually collateral of the Insider Lenders, any right of the Debtors to surcharge that collateral has been waived.  Plainly, a surcharge on the collateral if the proceeds go to the Tubbs Parties, but not if it goes to the Insider Lenders, amounts to disparate treatment of similarly situated

secured claims to the same collateral.  The Debtors have not disclosed a basis for this disparate treatment.

> **H.    The Disclosure Statement has No Meaningful Disclosure Regarding the Allocation and Distribution of the Proceeds from the Greenfield Sale**

41.    In the proposed distribution to the Insider Lenders, the Joint Plan uses a formula which contemplates a factor called, "*Allocated Value (Greenfield Sale)*," which "means as to any allocation of value between different assets of the Debtors that were subject to the Greenfield Sale (i.e., the sale of the Big River assets), the Stipulated Plan Value as to such assets, except to the extent such allocation of value is separately determined by the Court, in which case the Allocated Value will be as determined by the Court, unless otherwise agreed by the Plan Proponents and the Tubbs Parties."   Joint Plan, p. 6.   The term "Stipulated Plan Value" refers to the "allocation calculated by the Greenfield Purchaser," but then identifies the following values for each Debtor without identifying how the values correspond to the values assigned by the Greenfield Purchaser:

| Plan Proponent Value[12] | | Greenfield Purchaser Value[13] | |
|---|---|---|---|
| Bayou | $3,805,562.30 | Parkdale Facility | $9,251,441 |
| LakeProv | $1,245,236.50 | Lake Providence Facility | $16,294,123 |
| AMR | $10,365,098.70 | Crowville Facility | $2,665,900 |
| | | Dunn Facility | $1,244,690 |
| TOTAL: | $15,415,897.50 | TOTAL: | $29,456,153.00 |

---

[12] Joint Plan, p. 17.

[13] *See* Debtors' Exhibit entitled "Agspring Buyer Cost Allocation" from the March 22, 2022 hearing.

Elsewhere in the Joint Plan, the Debtors state that they sought approval for the sale of the Big River assets to the Greenfield Purchaser for $30,500,00 in cash.  *Id*. at 29.  And, the Debtors state they received $18.6 million in cash at closing and have paid at least $8,870,281.20 to the Insider Lenders.  *Id*. at 29, 40.  Describing the value of these assets as "Stipulated Value" is contrary to representations that the Debtors made at the hearings on the Debtors' Adequate Protection Motion where they stated unequivocally that they disputed the allocation by the purchaser of the Big River assets.  *See* March 2, 2022, p. 45.

42.    The Debtors therefore must disclose what party or parties reached the Stipulated Value, for what purpose the Stipulated Value was made, and the circumstances surrounding the Stipulated Value.  For example, is this only an agreement between the Debtors and the Insider Lenders on account of Class 3 claims for AMR?  Indeed, the Joint Plan suggests that this is a stipulation between Plan Proponents for distribution purposes to the Insider Lenders without any proof of allocation, value or adequate protection.  *See*, Joint Plan, p. 38:

> The Combined Disclosure Statement and Plan proposes distributions to holders of Allowed claims from proceeds of the Greenfield Sale in accordance with the Stipulated Plan Value, as defined in Section I.B.119, which is based on the allocation provided by the Greenfield Purchaser. This Stipulated Plan Value maximizes value by avoiding the need for the Debtors to incur the cost of proving the allocation of the Greenfield Sale Proceeds among the sellers to the Greenfield Sale (Bayou, LakeProv and AMR), as the Prepetition Term Secured Parties are entitled to such proceeds under any allocation by virtue of (a) their first-priority Lien on AMR's Greenfield Sale Proceeds, (b) their Prepetition Term Loan Claim against AMR and AGMS1 in respect of the Prepetition Term Guaranty, and (c) the fact that the Combined Disclosure Statement and Plan provides for the payment in full of all other Allowed Claims at Bayou, LakeProv, AGMS, and AGMS1.

Moreover, while the Court allowed a distribution to the Insider Lenders by Order approving the Debtors' Adequate Protection Motion, the issue of whether that payment was on account of adequate protection or a distribution of sale proceeds was expressly preserved, and the Debtors are

left to their proof, which they completely avoid in the Disclosure Statement, despite using values as a premise for claims distributions.

43.    Additionally, the allocation methodology in the Joint Plan is conclusory (because the Insider Lenders have all the collateral) and fails to take into account the contingent risk and possibility that the Dunn and Crowville Facilities could be returned to the AMR estate and fails to account for the fact that the Insider Lenders have no mortgage on these immovables, and therefore the assets are unencumbered.  All of these are factors necessary to understand from whose proceeds the distribution that the Insider Lenders already received was made, and whether the treatment of the Insider Lender's security interests are different than the treatment of secured claims of the Tubbs Parties to assets of AMR.

44.    Finally, the Insider Lenders were likely applying the same definition of a movable to the Greenfield Sale as they have in the Adversary Proceeding, in which case, the Tubbs Parties would object to distribution of those proceeds on account of the Insider Debtors' secured claim. If this is not the case, then this would eliminate a basis for objecting, thus the Disclosure Statement needs to be amended to provide further information.

45.    Given that the Greenfield Purchaser allocated the value of each facility that has a discrete owner, there is minimal cost to attributing the value of that asset to the Debtor who owns the asset. Thus, the Tubbs Parties object to the non-disclosure of the allocation of the assets to the individual Debtor estates and the basis from which Debtor was the payment of $8,870,281.20 to the Insider Lenders made.

      **I.**      **The Disclosure Statement Fails to Provide Adequate Information on Whether the Plan Provides a Better Outcome Than a Chapter 7 Liquidation**

46.    The Debtors have liquidated all assets except for the Tubbs Properties, which is the collateral of the Tubbs Parties.  The Joint Plan proposes either selling or surrendering the Tubbs

Properties. Without any discussion of the cost of a plan process, and how the disposal of the Tubbs Parties' collateral in the Joint Plan will cause that collateral to increase in value, there is no information from which a creditor can determine why the value of the Tubbs Properties decreases in value if the case were converted to a Chapter 7. Joint Plan, p. 95. The liquidation analysis in the Disclosure Statement does not meet the adequate disclosure standards for at least three reasons.

47.     First, the Exhibit A to the Plan is a consolidated analysis, even though the Joint Plan specifically provides that the Debtors' estates are not substantively consolidated. Second, Exhibit A provides no justification for the price a sale of the Tubbs Properties would yield in chapter 11 or chapter 7. Third, the Debtors have no equity in the Tubbs Properties, and they have provided no sufficiently detailed or admissible disclosures that explain how a liquidation under chapter 7 is any different than a liquidation under chapter 11, to say nothing of explaining how the Debtors will receive "equity" not realized if the Tubbs Properties are foreclosed upon in a state foreclosure proceeding.

> **J.     The Disclosure Statement contains an Inadequate Description of the Louisiana Litigation and Transactions by the Debtor AMR Regarding Transfers of its Assets**

48.     The Louisiana Litigation involves allegations of substantial wrongdoing by AMR in the form of unlawful transfers of assets, including between AMR and Lake Providence. Among other claims, the Louisiana Litigation challenges the ownership interests that Lake Providence claims in the Crowville and Dunn properties sold in the Greenfield Sale. Under Louisiana law, AMR fraudulently transferred these properties without any value given in return and without diminishing AMR's liabilities thus causing or increasing AMR's insolvency.

49.     The following series of transactions show the fraudulent transfer efforts. About two months after the Tubbs Parties accelerated the note as a result of AMR failure to pay an installment, on December 31, 2018, AMR transferred the Dunn and Crowville Facilities to Lake

Providence. D.I. 248-[] Exhibit G, Capital Contribution Agreement dated December 31, 2018. Lake Providence was formed on or about December 18, 2018, after the October 2018 default and acceleration of the Tubbs debt. After December 31, 2018, AMR assigned the membership interests in LPGR to Agspring MS, LLC, and 100% of the shares in Bayou Grain and Chemical Corporation to Lake Providence. D.I. 229-1, 3. Agspring MS, LLC then granted to CGBE and the Prepetition Secured Parties a lien on all of its personal property. D.I. 47, 10 # 15.1. Agspring MS, LLC only owns 100% of the membership interests in LPRG. *Id*.

50.     The membership interests in Agspring MS, LLC are held by Agspring MS1, LLC and this is the only property it owns. D.I. 45, 10 #15.1. Agspring MS1, LLC granted the Prepetition Secured Parties a lien on all of its personal property. D.I. 45, 9-12. Now AMR assets comprise only the Tubbs Collateral, leasehold interests in property on 501 Port Road in East Carroll Parish, and other personal property, including 100% of the membership interests in Agspring MS1, LLC. D.I. 43, #15.1. But for these transfers, unencumbered proceeds of a sale of the Crowville and Dunn real properties would have benefitted AMR, not Lake Providence, AMS or AMS1 none of whom owed the Tubbs Parties' debt.[14] Instead of a meaningful description of these transfers, the Disclosure Statement states only that "[o]n September 30, 2019, the Tubbs Plaintiffs filed suit (the "Louisiana Litigation") in the Sixth Judicial District Court, Parish of

---

[14] The Joint Plan contains an incomplete and factually misleading description of these transactions.

On December 31, 2018, in anticipation of a possible joint venture, AMR entered into a capital contribution agreement that contributed, among other things, AMR's real property interest in the real property facilities commonly known as the Crowville and Dunn facilities and its equity interest in Bayou to LakeProv in exchange for the increased value of the equity of AGMS1, which indirectly owns LakeProv through AGMS. The Prepetition Term Secured Parties held Liens encumbering the Crowville and Dunn properties at the time of the capital contribution agreement, which Liens were released following the contribution transaction in or about February 2019. [D.I. 377, 24]

Madison, State of Louisiana (the "Louisiana State Court"), Case No. 19-198, against Debtors AMR

and LakeProv, Agspring, Pacific Investment Management Company LLC, and other defendants

with regard to the Tubbs Note."  Joint Plan, p. 36.  The foregoing is not adequate information

under section 1125 of the Bankruptcy Code.  To resolve this omission, at the very least, the

following paragraph should be added to Section II.C.7.a of the Disclosure Statement:

> The Louisiana Litigation includes but is not limited to claims 1) against AMR and
> its non-Debtor parent company, Agspring, LLC on the Tubbs Note, mortgages, and
> guarantee to recover the amounts due on the Tubbs Note; 2) against AMR and
> LakeProv to unwind the transfer by AMR of the Dunn and Crowville properties in
> exchange for membership interests in LakeProv, created after the default on the
> Tubbs Note, which caused or increased AMR's insolvency; 3) against AMR,
> LakeProv and multiple non-Debtors defendants for Louisiana Unfair Trade
> Practices in transferring money and assets for the purposes of hindering, delaying
> or defrauding the Tubbs Parties' efforts to collect the Tubbs Note; and 4) a suit
> against Pacific Investment Management Company and Barings, who held
> themselves out as holders of the Term Loan obligations, for disguising the Term
> Loan as a debt instead of an equity interest and obtaining payments on account of
> that debt when AMR was insolvent.  This Term Loan is the same Term Loan of
> which the Prepetition Secured Lenders claim to be the holders and forms the basis
> of their claims herein.

51.    Moreover, the Joint Plan does not provide for any contingencies upon the outcome

of the Louisiana Litigation, with respect to assets held by each debtor, or the distribution of assets

of each debtor after that litigation concludes.

### K.    The Disclosure Statement contains Inadequate Description of Executory Contracts and Unexpired Leases.

52.    The Disclosure Statement does not adequately identify what executory contracts

and unexpired lease exist or correctly describe the unexpired lease rights and rights of first refusal

held by CGB.[15]

---

[15] The Disclosure Statement and Joint Plan also indicate that CGB still holds liens on estate
assets while the Insider Lender's previous filing at D.I. 253-1, 2, indicate that these liens have been
extinguished by payment.

53.     While the Disclosure Statement correctly states that CGB has "two separate five-year leases of land, grain storage facilities, and other real and personal property to CGB (the "CGB Leases"), and (c) a number of agreements ancillary to the CGB Purchase Agreement and the CGB Leases (together with the CGB Purchase Agreement and the CGB Leases, the "CGB Transaction") Joint Plan, p. 24, it incorrectly describes the termination period in the leases of the Tubbs Properties and does not address the operation of the right of first refusal in both of these leases.

54.     The only disclosure regarding termination of the CGB lease rights and rights of first refusal states: "CGB continues to lease and use the facilities and assets for grain and other crop storage, processing, handling, shipment, and related operations. Pursuant to the CGB Leases, CGB pays the Debtors $750,000 per year in rent. The CGB Leases each have a five-year term, with an early termination option after two years in the event of a sale of a leased property, subject to a right of first refusal in favor of CGB."  Joint Plan, p. 31.  There is no disclosure of whether CGB exercised its rights of first refusal in connection with the Greenfield Sale, nor is there any discussion of how CGB would exercise its rights of first refusal in any sale of the Tubbs Properties.

55.     Under Section 365(h)(1)(A):

**If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—**

(i)if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

**(ii)if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.**

11 U.S.C. § 365(h)(1)(A)(emphasis added). There is no disclosure regarding the termination and

rights of first refusal provisions in either lease or whether the Debtors have triggered or terminated

any of these rights, both of which are necessary to understand the proposed surrender or sale of

the Tubbs Properties because in Louisiana a bankruptcy sale of assets does not necessarily trigger

a right of first refusal similar to those in the CGB Leases. *See, Royal Oldsmobile Co., Inc. v.

Heisler Properties, L.L.C.,* 10–152 (La.App. 5 Cir. 12/28/10), 58 So.3d 48  and *Mang v. Heisler

Properties, LLC*, 96 So. 3d 521 ((La. App. 5 Cir. 5/22/12), *writ denied*, 96 So. 3d 521 (La. 2012).

56.      In Louisiana, a right of first refusal over an immovable can be exercised for ten

years. La. Civ. Code Ann. art. 2628.  The Tubbs Property lease with CGB has the following right

of first refusal provision:

> 18.13 Right of First Refusal. If, during the Term, Landlord receives a bona fide offer from a third party to purchase any or all of the Properties, which Landlord is willing to accept, **then Landlord shall provide written notice thereof to Tenant setting forth the identity of the proposed purchaser, the proposed purchase price (which must be in cash only); and all other material terms and conditions of the proposed purchase (provided that such terms and conditions may not require the provision of consideration for the purchase other than cash). Such notification from Landlord shall constitute an offer by Landlord to Tenant for Tenant's purchase of the affected Property or Properties at such price and on such terms and conditions, and Tenant shall have thirty (30) days from receipt thereof to accept such offer subject to the negotiation, in good faith, of a customary purchase agreement consistent with such price and terms and conditions**. Should Tenant fail to accept such offer as set forth in the preceding sentence within such thirty (30) day time period, Tenant shall be deemed to have rejected Landlord's offer, and Landlord shall be permitted to sell the affected Properties to the offering third party but only on the terms and conditions offered to Tenant and provided that such third party sale closes within ninety (90) days of Tenant's rejection or deemed rejection of the offer. Subject to Section 15.03, any sale to such third party shall be made subject to this Lease with assignment thereof with respect to the Properties sold. (Emphasis added).

A right of first refusal is also triggered by a surrender of the properties to the Tubbs Parties in

return for a credit on the purchase price. *Gorum v. Optimist Club of Glenmora* 771 So. 2d 690

(La. App. 3d Cir. 2000).  Without some disclosure on when and how the Tubbs Properties might

be sold, surrendered, and the treatment of this right of first refusal, the Disclosure Statement fails to give adequate information on how and ultimately, to whom, the properties will be liquidated and whether the sale or surrender will be subject to the right of first refusal.

57.     The Disclosure Statement is also devoid of any discussion of the termination provisions in the CGB Lease of the Tubbs Properties, which is different from the termination provisions for the other CGB Lease.  The two termination provisions in the Tubbs Properties lease with CGB state:

1.01    Term. The term (the "Term") of this Lease shall commence on the Effective Date and shall terminate on the last day of the calendar month occurring five (5) years thereafter, unless sooner terminated or extended as hereinafter provided.

…

15.03 Landlord's Early Termination Right. Upon the closing of the sale of all, but not less than all of the Properties by Landlord, Landlord shall have the right to terminate this Lease as to all, but not less than all, of the Properties, provided, however, that any such termination shall not take effect unless and until: (i) the second anniversary of the Effective Date or any anniversary date thereafter; (ii) Tenant is provided at least one hundred eighty (180) days' advance written notice of such termination; and (iii) all of the CGB Indebtedness has been paid in full, or will be paid in full on the effective date of this Lease's termination under this Section 15.03.

…

18.04 Subordination, Nondisturbance, and Attornment. Landlord represents and warrants to Tenant that, as of the Effective Date, a first-lien mortgage or deed of trust encumbering the Properties is a mortgage in favor of Larry G. Tubbs, Tubbs Rice Dryers, Chief Ventures, L.L.C., and Big River Grain, LLC (the "Tubbs Mortgages"). If any of the Properties are sold as a result of a default under the Tubbs Mortgages, or pursuant to a transfer in lieu of foreclosure, this Lease shall automatically terminate as of the date of the transfer, Tenant shall receive a refund of Base Rent paid to Landlord applicable to the period after the date of termination and Landlord and Tenant shall have no further obligation one to another except as expressly provided herein. Landlord represents and warrants to Tenant that, as of the Effective Date, a second mortgage or deed of trust encumbering any of the Properties is a mortgage in favor of U.S. Bank National Association, as Administrative Agent for HVS V LLC and LVS II SPE XVIII LLC. This Lease is automatically subordinate to the Landlord's Mortgage without any further action or writing of the parties. If any of the Properties are sold as a result of a default under

the Landlord's Mortgage, or pursuant to a transfer in lieu of foreclosure, Tenant shall, at the Landlord's Mortgagee's or Landlord's sole election, attorn to the mortgagee or purchaser. …

According to these provisions, depending on who acquires the properties and for what purposes they are sold, the termination provisions are different.  The Disclosure Statement is inadequate because it fails to address whether any termination provision will be or has been triggered in either lease, whether the rights of first refusal will be rejected prior to any sale of the Tubbs Properties or afterwards, and whether the automatic termination provision would or would not be triggered by a surrender of the Tubbs Properties to the Tubbs Parties.

## **CONCLUSION**

For the reasons set forth herein, the Tubbs Parties respectfully request that the Court reject the Disclosure Statement.

Dated: April 11, 2022            CROSS & SIMON, LLC

*/s/ Christopher P. Simon*
Michael L. Vild (No. 3042)
Christopher P. Simon (No. 3697)
1105 North Market Street, Suite 901
Wilmington, Delaware 19801
(302) 777-4200 (Telephone)
mvild@crosslaw.com
csimon@crosslaw.com

- and -

J. E. Cullens, Jr., Esquire
Andrée M. Cullens, Esquire
WALTERS, PAPILLION, THOMAS,
CULLENS, LLC
12345 Perkins Road, Bldg. 1
Baton Rouge, LA 70810
Telephone: (225) 236-3636
cullens@lawbr.net
acullens@lawbr.net

- and -

Paul M. Sterbcow, Esquire
LEWIS, KULLMAN, STERBCOW &
ABRAMSON, LLC
601 Poydras Street, Suite 2615
New Orleans, LA 70130
Telephone: (504)588-1500
sterbcow@lksalaw.com

*Counsel for Larry Tubbs, Tubbs Rice Dryers, Inc.,*
*Chief Ventures, L.L.C. and Big River Grain, LLC*